No. 105,057

STATE OF KANSAS, *Appellee*, v. DUSTIN B. HILT, *Appellant.*

(322 P.3d 367)

Opinion filed April 18, 2014.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Stephen M. Howe*, district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Dustin B. Hilt appeals his convictions and sentences arising out of the September 2009 murder of his ex-girlfriend. Hilt raises nine issues challenging his convictions and two challenging his sentences. Before oral argument, this court also sought supplemental briefing from the parties on additional hard 50 sentencing issues.

Today we reject Hilt's claims of reversible error and affirm his convictions. We vacate his sentence for first-degree murder and remand the case for resentencing on that crime.

## ISSUES

- Did the district judge err by denying Hilt's request to supplement the jury's instruction on aiding and abetting?
- Did the district judge err by dismissing and replacing a juror with an alternate?
- Did the district judge err by admitting evidence of a knife and a piece of charred pipe?
- Did the district judge err by admitting testimony about a blood-spatter test?
- Did the district judge err by denying Hilt's request for a jury instruction on the defense of voluntary intoxication?
- Did the district judge err by denying Hilt's request for a jury instruction on voluntary manslaughter as a lesser included offense of first-degree murder?
- Did the district judge err by admitting two gruesome photographs of the victim's wounds?
- Did the prosecutor commit reversible misconduct during closing argument by comparing the facts of this case to a scene from the movie *GoodFellas* and suggesting that the defendant and others pulled the victim from her car trunk and "finished the job" of killing her?
- Did cumulative error deny Hilt's right to a fair trial?

- Did the district judge err by sentencing Hilt to the high number in the Kansas Sentencing Guidelines Act grid box for each of the aggravated kidnapping and aggravated robbery convictions?
- Was Kansas' hard 50 sentencing scheme unconstitutional under *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), because the judge found the existence of aggravating factors by a preponderance of the evidence rather than the jury finding their existence beyond a reasonable doubt? If so, can the hard 50 sentencing scheme as amended by the Kansas legislature in 2013 be applied to Hilt on remand without violation of the federal Constitution's prohibition on ex post facto laws?

## FACTUAL AND PROCEDURAL BACKGROUND

Hilt was convicted by a jury of first-degree premeditated murder, an off-grid person felony; aggravated kidnapping, a severity level 1 person felony; and aggravated robbery, a severity level 3 person felony. He received a hard 50 life sentence for the murder, based on the district judge's finding that four aggravating factors were applicable: infliction of mental anguish or physical abuse before the victim's death; torture of the victim; continuous acts of violence begun before or continuing after the killing; and especially heinous, atrocious, or cruel conduct by the defendant. Hilt also received consecutive sentences of 165 months and 61 months for the aggravated kidnapping and aggravated robbery convictions. These two sentences were at the high end of the applicable Kansas Sentencing Guidelines Act grid box range.

Johnson County detectives found the body of Hilt's ex-girlfriend, Keighley Alyea, in a field in Cass County, Missouri. Alyea had been stabbed dozens of times with a knife. Her body also showed signs that she had been asphyxiated and had suffered blunt-force trauma to her head.

Six days before Alyea's body was discovered, she had invited Jessika Beebe; Beebe's daughter; and Beebe's boyfriend, Shawn Merritt, to spend the night at her apartment. Beebe and Merritt did not feel safe staying at Beebe's residence because they feared

Beebe's brother, James. Two days earlier, James had intentionally rammed his vehicle into Alyea's vehicle and threatened to "shoot [Merritt's] house up." James was later arrested in connection with this incident.

Merritt was so concerned about James' threat that he told Alyea he needed to get a gun for protection. Alyea suggested to Merritt that he contact Hilt. That night Merritt used Alyea's phone to send a text message to Hilt to ask if Hilt knew where to get a gun. After a series of text messages between Hilt and Merritt, Hilt asked for a ride. Merritt returned the phone to Alyea, and Hilt sent two additional messages requesting a ride. Alyea then sent a message identifying herself and asked Hilt if he wanted to "come kick it." Hilt again said he needed a ride. Shortly after 1 a.m., Alyea agreed to pick Hilt up and asked if he was with anyone else. Hilt responded that he was with Scott Calbeck. Before Alyea left to meet Hilt, Beebe advised her not to go.

About 2 a.m., Hilt; Calbeck; and Hilt's cousin, Joe Mattox, entered a QuikTrip convenience store. Surveillance video footage from the store showed, among other things, what Hilt was wearing. Meanwhile, Alyea, who was waiting in her car outside the convenience store, called her stepsister. Alyea accused the stepsister of having had sex with Hilt, threatened to beat her up, and then hung up. A heated text message exchange between Alyea and the stepsister followed—full of threats, name calling, and other insults. Alyea sent her last text message at 2:50 a.m. The stepsister would later testify that she had sent a text message to Alyea at 2:53 a.m. and expected it to elicit an immediate response. Instead, no response ever came.

When Beebe woke up about 11 a.m., Alyea was not in the apartment. Beebe tried calling Alyea multiple times. When that was unsuccessful, she called Alyea's family and checked at Alyea's work, the hospital, and the jail. She did not find her.

The Overland Park Police Department began a missing person investigation. Sergeant Thomas Smith interviewed Hilt and asked when Hilt last talked with Alyea. Hilt said it had been several weeks or months. When presented with a printout of Alyea's text message correspondence, Hilt admitted that he had recently communicated

with Alyea, but he maintained that the two had not seen each other recently.

The next day, police officers discovered Alyea's car in an apartment parking lot. When they opened the trunk, they found pooled blood and bloody clothing. During processing of the car at the Johnson County Sheriff's Office crime lab, a technician found a knife under bloody clothing in the trunk. The technician also noted that the car's taillight assemblies had been loosened from their mounts, and the connecting tabs had been disconnected, disabling the taillights. Both the taillight connectors and the trunk latch had smears of blood on them. Crime scene investigators did not initially link the knife to Alyea's disappearance or death.

The day after Alyea's vehicle surfaced, detectives conducted a search at Mattox' residence. They found a piece of charred metal pipe in a smoker grill, as well as other charred and burned items. A can of gasoline sat next to the smoker grill. In the basement, detectives opened a dishwasher and discovered a black plastic trash bag full of bloody clothing.

The same day, Alyea's body was found. Its condition had been damaged by decomposition and insects.

Several months passed. After Hilt had been charged, investigators searched his grandparents' house. They found more bloody clothes that matched those Hilt was wearing on the night of Alyea's disappearance. Subsequent DNA testing confirmed that the blood on the clothes from Hilt's grandparents' house matched Alyea's blood to a reasonable degree of scientific certainty.

Before trial, Hilt's counsel filed a motion in limine to exclude any reference to the knife or the charred piece of pipe. While arguing the motion, defense counsel conceded the admissibility of the knife, stating, "I'm going to stipulate that the knife now bears some relevance. We will deal with that on cross." The district judge ruled that a second, undamaged piece of pipe found lying in Mattox' yard was inadmissible, but he ruled that evidence of the piece of charred pipe found in the smoker grill could be admitted at trial.

During opening statements to the jury, Hilt's counsel said that Hilt had lied to officers about his contact with Alyea and his whereabouts on the night of her disappearance. Hilt's counsel also con-

ceded that Hilt was with Alyea the night she was murdered but asserted that Hilt did not participate in her murder or assist her killer, Mattox.

Medical examiner Mary Dudley testified about the autopsy she performed on Alyea's body. While questioning Dudley, the State moved to admit several autopsy and crime scene photos depicting Alyea's injuries. Hilt objected to two photos as cumulative and gruesome. The district judge overruled the objection.

Kristine Olsson, a forensic scientist for the Johnson County Sheriff's Office crime laboratory, testified about bloodstain analysis she performed during the investigation. She discussed both transfer stains and spatter stains. Transfer stains, she said, occur when a bloody object makes contact with a nonbloody surface. Spatter stains, she said, result after a liquid source of blood is disturbed by enough force to break up the blood's contusive nature, causing droplets to disperse. According to Olsson, a group of spatter stains form what is called an impact pattern. Cast-off patterns are those created when blood is flung off an object in motion.

Olsson also testified about a test she conducted to determine "how far [blood] spatter would travel during an impact event." She filled a 4-inch box with sawdust and placed the box on the floor. She placed a pork roast on top of the box and a blood-soaked kitchen sponge on top of the roast. A lab technician, wearing a sweatshirt similar to the one Hilt wore on the night Alyea was murdered, then attempted to stab the bloody sponge. Because the sponge would not stay in place, it was duct-taped to the roast. The lab technician then stabbed the sponge 20 times. Olsson documented the spatter stains on the sweatshirt and surrounding area. When the State moved to admit photographic evidence of the test, Hilt objected based on a lack of scientific foundation. After a voir dire, the district judge overruled the objection. Olsson testified about blood stains on the sweatshirt Hilt wore the night Alyea was murdered, and she concluded that they were spatter stains that resulted from an impact event.

Alyea's grandfather, Don, testified that he had thoroughly cleaned Alyea's car, including its trunk, 2 days before Alyea's disappearance. He did not see a knife or piece of pipe in the car at

that time. He also testified that the taillight assemblies were secure and intact when he observed them.

During the district court conference on jury instructions, Hilt's counsel requested a supplement to the aiding and abetting instruction. The requested instruction would have informed jurors that "[m]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor." The State argued in response that PIK Crim. 3d 54.05 sufficiently stated the law and required no supplement. The district court judge denied Hilt's request and gave PIK Crim. 3d 54.05 without supplement. The judge also denied the defense requests for instructions on voluntary intoxication and voluntary manslaughter.

During closing argument, the prosecutor stated that the facts in this case were "eerily similar" to a scene in the movie *GoodFellas*, in which a wounded victim was transported in a trunk. As in the movie, the prosecutor said, "[A]t some point in time, [Hilt and the two other men] pulled [Alyea] back out of the trunk and finished the job."

After Hilt's jury had begun deliberations, jurors sent a note to the district judge questioning how they should proceed "when we feel a juror has been compromised." The judge instructed the jury that it was to use the evidence and the law to reach its verdict. A few minutes later, the jury sent a second note informing the court that the jury had voted 11-1 to remove the compromised juror. The district judge then met with the presiding juror, who said that the compromised juror had violated the court's admonition by referencing information not admitted as evidence in the trial. The district judge interviewed the juror in question, who denied viewing outside media reports or otherwise violating the admonition. The district court judge then interviewed the 10 remaining jurors individually; each confirmed the presiding juror's original allegation. One of the jurors, however, expressed concern that the move to vote out the juror in question may have been motivated by that juror's minority view on Hilt's guilt. The district judge ultimately concluded that the compromised juror would be removed for dis-

obedience of the admonition. The judge then seated an alternate juror and ordered the jury to begin deliberations anew.

After the jury restarted deliberations, Hilt's counsel objected to the seating of the alternate. Counsel said he had been informed that the alternate was in "very close proximity" to Alyea's family and the media while the original jury was deliberating. The district judge asked the alternate if she had discussed the case or overheard any conversations about the case since the beginning of trial. She said she had not, and the judge overruled the defense objection.

After the jury returned its guilty verdicts, Hilt presented evidence in mitigation of sentence—his age of 18, lack of criminal history, and family support. The district judge was unconvinced that the mitigators outweighed the aggravators and gave Hilt a hard 50 life sentence for Alyea's murder.

## SUPPLEMENT TO AIDING AND ABETTING INSTRUCTION

When this court reviews appellate claims on jury instructions,

"the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

"Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. *State v. McCullough*, 293 Kan. 970, 974, 270 P.3d 1142 (2012) (self-defense). And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008)." *State v. Friday*, 297 Kan. 1023, 1036-37, 306 P.3d 265 (2013).

We examine "jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." *State v. Williams*,

42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 (2009), *rev. denied* 290 Kan. 1104 (2010).

Hilt argues that the facts of his case and his theory of defense required the district judge to instruct the jury that "[m]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor." Without this supplement to the usual PIK instruction, Hilt contends, the jury was left with an incomplete understanding of aiding and abetting theory.

The additional instruction language Hilt sought properly states the law in Kansas. See *State v. Jefferson*, 297 Kan. 1151, 1167-68, 310 P.3d 331 (2013). But we have previously rejected arguments that the language was indispensable to a jury's understanding of a case. See, *e.g., State v. Edwards*, 291 Kan. 532, 551-52, 243 P.3d 683 (2010) (refusal to give "mere association or presence" language not reversible error); *State v. Holt*, 285 Kan. 760, 772, 175 P.3d 239 (2008) (refusal to give "mere presence or association" language not error); *State v. Davis*, 283 Kan. 569, 582-83, 158 P.3d 317 (2006) (refusal to instruct on "mere presence" not reversible error).

In *Edwards*, defendant Edrick Edwards made the same argument that Hilt raises on this appeal. The State had charged Edwards with felony murder and attempted aggravated robbery. At trial, Edwards' theory of defense was that he was with the three perpetrators at the time of the crime, but he had been unaware of their plan to rob the victim. Edwards requested a modification to the aiding and abetting instruction to include the same language at issue here. The district court denied Edwards' request to supplement the aiding and abetting instruction. On appeal, this court acknowledged that the requested language "precisely fit the defense theory." 291 Kan. at 552. And this court even suggested that "the better practice would have been to modify the patterned instruction" as requested. 291 Kan. at 552. But this court ultimately held that refusal to supplement the aiding and abetting instruction was not reversible error. 291 Kan. at 552.

We arrive at the same conclusion here. PIK Crim. 3d 54.05 on aiding and abetting, given without the additional language, was not reversible error. However, the better practice is to add the re-

quested language in cases such as this, and failure to do so may imperil convictions in future similar cases. *See State v. Llamas*, 298 Kan. 246, 258-62, 311 P.3d 399 (2013).

### Dismissal of Juror and Seating of Alternate

Hilt argues that the district judge erred when he dismissed the compromised juror for misconduct and seated an alternate in the juror's place. Hilt does not argue that juror misconduct prejudiced him at trial.

A district judge's decision to discharge a juror and substitute an alternate juror is reviewed for abuse of discretion. *State v. Stafford*, 255 Kan. 807, 824, 878 P.2d 820 (1994). "A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *State v. Dobbs*, 297 Kan. 1225, 1232, 308 P.3d 1258 (2013) (citing *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]). A defendant bears the burden to demonstrate the existence of an abuse of discretion. *State v. Baker*, 297 Kan. 482, 484, 301 P.3d 706 (2013).

Under K.S.A. 22-3412(c), a juror may be substituted after deliberations have begun as long as the alternate juror has not been discharged. See *State v. Cheek*, 262 Kan. 91, Syl. ¶¶ 1-4, 936 P.2d 749 (1997); *State v. Haislip*, 237 Kan. 461, 467-69, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985). "Dismissing one juror and replacing that juror with an alternate is not an abuse of discretion where 'reasonable cause' exists." *State v. Stallings*, 246 Kan. 642, Syl. ¶ 2, 792 P.2d 1013 (1990).

This court has held that reasonable cause exists for dismissal of a juror when a juror becomes ill, incapacitated, or is affected by personal problems. See *Stallings*, 246 Kan. at 647-48 (dismissal during deliberations proper after juror explained personal religious beliefs prevented judgment); *Haislip*, 237 Kan. at 468-71 (dismissal during deliberations proper when juror "mentally incapacitated to perform her duty"); *State v. Folkerts*, 229 Kan. 608, 616, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981) (dismissal during trial proper based on death of juror's grandfather, out-of-state funeral). A trial judge also may discharge jurors for reasonable cause if they

are found to be unable to perform their duties. *State v. Minski*, 252 Kan. 806, 815, 850 P.2d 809 (1993).

Hilt relies on *Cheek*, in which this court held that a district judge erred when dismissing a juror absent reasonable cause to do so. See 262 Kan. at 107-08. In *Cheek*, a juror asked the district judge to release him from the jury after the first day of deliberations. The district judge interviewed the juror and then dismissed him. This court held that, under the facts of that case,

"there was no reasonable cause to dismiss a juror who suffered from no impairment; appeared to hold a different view from the other jurors; believed his convictions could not be changed; was not ill, incapacitated, or affected by personal problems; was unaffected by the high visibility of the case; and clearly stated that if he remained on the jury he did not believe a decision could be reached." 262 Kan. 91, Syl. ¶ 5.

This case is meaningfully distinct from *Cheek*, where the dismissed juror was not accused of misconduct. Here, the district judge, after interviewing all 12 jurors, determined that the juror in question had violated the court's admonition not to read or view media reports about the case and had injected outside information into the jury's deliberations. Such misconduct constitutes reasonable cause sufficient to support the district judge's decision to dismiss the juror. See *Bell v. Uribe*, 729 F.3d 1052, 1060-61 (9th Cir. 2013) (dismissal of juror after she consulted outside sources, attempted to function as unsworn expert appropriate under federal law); *State v. Cook*, 170 Ariz. 40, 54, 821 P.2d 731 (1991) (no error in dismissing juror who violated admonition); *People v. Nunez and Satale*, 57 Cal. 4th 1, 55, 158 Cal. Rptr. 3d 585, 302 P.3d 981 (2013) (trial court had good cause to dismiss juror who violated court's admonition not to discuss case with anyone outside jury room); *People v. Daniels*, 52 Cal. 3d 815, 865, 277 Cal. Rptr. 122, 802 P.2d 906 (1991) (juror has duty to follow admonition, instructions; judge may "reasonably conclude" juror who read newspaper accounts of trial "cannot be counted on to follow instructions in future").

Although the statement by one juror suggesting that the dismissed juror may have been singled out by her peers because of a minority view on the defendant's guilt is troubling, the consistency of the stories told by the jurors collectively supports the judge's

ruling that the juror had engaged in misconduct and had to be discharged and replaced. There was no abuse of discretion attributable to an insufficient factual basis for the judge's decision or to any legal error or unreasonableness.

Hilt's additional argument that the district judge erred in seating a "potentially tainted [alternate] juror" also is unpersuasive. According to Hilt, "the alternate juror had been sitting closely to law enforcement and the victim's family, strengthening the potential for a tainted alternate juror." But our review of the record indicates that defense counsel simply alerted the judge that the alternate juror, media representatives, and the victim's family had all been in the courthouse hallway during deliberations. Although *Cheek*, 262 Kan. at 104, mentioned "the necessity of keeping alternates in the posture of actual jury members until a verdict is reached and they are discharged from service," we see no abuse of discretion here. It may have been a better practice for the district judge to sequester alternate jurors from spectators when the jury began its deliberations, but we are reassured by the judge's reminder to the alternates that they were still under the court's admonition. Further, after Hilt's trial counsel raised a concern about the alternate juror, the district judge asked the alternate whether she had discussed the case with anyone since she was placed on the court's admonition or had overheard any conversations related to the case in that time period. The alternate answered "no" to both questions.

## ADMISSION OF KNIFE AND CHARRED PIECE OF PIPE

Hilt next challenges the district judge's admission of the knife found in the trunk of Alyea's car and the charred piece of pipe found in the smoker grill at Mattox' home. Hilt argues that neither was definitively linked to Alyea's murder, focusing on the medical examiner's inability to conclusively determine the type of knife used and on crime scene investigators' initial belief that the knife was not the murder weapon.

Appellate review of a district judge's decision to admit or exclude evidence involves a multistep analysis. *State v. Everett*, 296 Kan. 1039, 1044, 297 P.3d 292 (2013) (citing *State v. Shadden*, 290 Kan.

803, 817, 235 P.3d 436 [2010]). First, an appellate court determines whether the evidence is relevant.

"Evidence is relevant when it has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b). Accordingly, relevant evidence must be both probative and material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]). Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. *Shadden*, 290 Kan. at 817 (citing *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 [2008])." *State v. Bridges*, 297 Kan. 989, 995-96, 306 P.3d 244 (2013).

Under the second step, the appellate court reviews de novo the district judge's conclusion as to which rules of evidence or other legal principles apply. *Shadden*, 290 Kan. at 817.

On the third step, this court reviews the district judge's application of the rule or principle either for abuse of discretion or de novo, depending on the nature of the rule or principle. 290 Kan. at 817.

Hilt first argues that both the knife and the charred piece of pipe lacked relevance to the crime charged. Although Hilt stipulated to the relevance of the knife at the motion in limine hearing, he objected at trial to its admission to "preserve the issues raised in the pre-trial filings [and] pre-trial motions." As to the charred knife, Hilt lodged the "[s]ame objection that was briefed well before trial." Under these circumstances, we regard Hilt's appellate arguments on the relevance of the knife and charred piece of pipe as preserved for appellate review.

Relevance encompasses two concepts: materiality and probative value. "Material evidence tends to establish a fact that is at issue and significant under the substantive law of the case." *Bridges*, 297 Kan. at 999 (citing *Reid*, 286 Kan. at 505). Materiality is reviewed on appeal under a de novo standard. 297 Kan. at 996 (citing *Shadden*, 290 Kan. at 817). "[P]robative evidence only requires a logical connection between the asserted facts and the inferences they are intended to establish." 297 Kan. at 999 (citing *State v. Richmond*, 289 Kan. 419, 437, 212 P.3d 165 [2009]). A district court judge's determination that evidence possesses probative value is reviewed

on appeal under an abuse of discretion standard. 297 Kan. at 996 (citing *Shadden*, 290 Kan. at 817).

Historically, an alleged murder weapon has constituted relevant evidence, even when the connection between the weapon and the crime is extremely thin. See *State v. Francis*, 282 Kan. 120, 136, 145 P.3d 48 (2006). "When a physical object is offered into evidence and à question arises as to its connection with either the defendant or the crime charged, the object should be admitted for such weight and effect as the jury sees fit to give it, unless it is clearly irrelevant. *State v. Ji*, 251 Kan. 3, 15, 832 P.2d 1176 (1992)." *State v. Cooper*, 252 Kan. 340, 348, 845 P.2d 631 (1993); see *Francis*, 282 Kan. at 136 (lack of positive identification of alleged murder weapon went to weight not admissibility); see also *State v. Scott-Herring*, 284 Kan. 172, 176-77, 159 P.3d 1028 (2007) (photograph of defendant holding gun "relevant to establish his possession of a gun resembling the possible murder weapon on the night of [the victim's] murder").

From these cases, using today's vernacular, we synthesize two rules of law: (1) Evidence of a murder weapon is always material in a homicide prosecution; and (2) whether evidence of a particular weapon is probative on the material issue of a murder weapon depends on the presence and quality of evidence on that particular weapon's connection or lack of connection to the crime charged and/or the defendant. To mark the ends of the probative value continuum, we set out extreme examples: When a victim is fatally shot inside his or her home, and the alleged lone perpetrator is apprehended while holding a gun matching that used to kill the victim and while still inside the home, another gun found by investigators behind a shrub down the street is not probative on the material issue of the weapon used in the homicide. On the opposite end of the continuum is a bloody knife covered with fingerprints found next to the lifeless body of a stabbing victim killed with a knife similar in length, width, and edge. That knife by the body has probative value to the material issue of the weapon used in the homicide, because it is connected to the crime charged. If it was not found by the body but in the glove compartment of a car be-

longing to the defendant, or the fingerprints matched the defendant's, it would also be probative.

Here, the knife was found under a pile of bloody clothing in the trunk of Alyea's car; Alyea had been stabbed dozens of times; and Hilt was linked to the car the night that Alyea disappeared. The knife was offered to show that Hilt, or one of the other occupants of the vehicle, had access to it and may have used it the night Alyea was murdered. This situation is far closer to the end of the spectrum in which a possible murder weapon has great probative value, and the district judge did not abuse his discretion in determining that the knife was relevant evidence.

As for the piece of charred pipe, the medical examiner testified that the circumference of the pipe was consistent with whatever object inflicted the blunt-force trauma Alyea suffered. In addition, the pipe's discovery in the smoker grill at the Mattox residence connected it to a man in Alyea's and Hilt's company on the night of Alyea's disappearance; and the pipe's charred appearance suggested that someone may have tried to burn it to eradicate biological evidence or fingerprints that otherwise may have been recoverable from it. Thus the piece of charred pipe was probative of the material issues regarding the murder weapon. The district judge did not abuse his discretion in determining that it was relevant evidence.

Hilt's other complaint related to the knife and pipe is that relevance is not enough for admission. He states simply that the two items were more prejudicial than probative. Hilt's bare assertion is not enough to discharge his burden to demonstrate an abuse of discretion. We regard this argument as abandoned. See *State v. Holmes*, 278 Kan. 603, 622, 102 P.3d 406 (2004) (issue not adequately briefed deemed abandoned).

There was no error in the admission of the knife and piece of charred pipe as evidence in Hilt's trial.

## ADMISSION OF BLOOD-SPATTER-TEST EVIDENCE

Hilt argues on appeal that the district judge erred because the blood-spatter test was conducted under conditions dissimilar to those that existed at the time of Alyea's murder. He contends that

the dissimilarities rendered the test and its results irrelevant and inadmissible.

The threshold problem with this issue is that it was not preserved for appeal by a contemporaneous relevance objection in the district court. See K.S.A. 60-404; *State v. Race*, 293 Kan. 69, 78, 259 P.3d 707 (2011) (issue not preserved because appellant failed to make correct contemporaneous objection at trial). Only after forensic scientist Olsson had testified about the blood-spatter test and its results and the State had moved to admit photographic evidence of the test did Hilt's counsel object. Even then, counsel's objection was based on lack of scientific foundation, not relevance. On appeal, Hilt does not challenge the underlying scientific reliability of the test. See *State v. Canaan*, 265 Kan. 835, 849, 964 P.2d 681 (1998) (applying *Frye v. United States*, 293 F. 1013 [D.C. Cir. 1923] [scientific tests must be shown reliable before results of test admissible]).

Because the relevance issue Hilt presents now was not preserved, any error we might find cannot be the basis of reversal of his convictions. K.S.A. 60-404 (verdict or judgment shall not be reversed "by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection"). We thus decline to reach the merits of this issue.

## VOLUNTARY INTOXICATION INSTRUCTION

Hilt next directs this court to evidence that he had been drinking the night of Alyea's death. Hilt told police during questioning that he had been "partying" and that he told Alyea he would give her beer if she gave him a ride. This evidence, in Hilt's view, made the district judge's denial of his request for a jury instruction on voluntary intoxication reversible error.

Our standard of review on this issue is the same as that used on the first issue regarding supplementation of the aiding and abetting instruction.

"While voluntary intoxication is not a defense to general intent crimes, such a defense may be used to negate the intent element of a specific intent crime. *State v. Brown*, 291 Kan. 646, 654, 244

P.3d 267 (2011); see K.S.A. 21-3208(2)." *State v. Kidd*, 293 Kan. 591, 594, 265 P.3d 1165 (2011). "A voluntary intoxication instruction is required when the evidence, viewed in the light most favorable to the defendant, shows that the defendant was intoxicated to the extent that his or her ability to form the requisite intent was impaired." *State v. Hernandez*, 292 Kan. 598, Syl. ¶ 4, 257 P.3d 767 (2011). "This court will not infer impairment based on evidence of consumption alone." 292 Kan. at 607.

A voluntary intoxication instruction would not have been legally or factually appropriate. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). The evidence relied upon by Hilt, even when viewed in the light most favorable to him, points only to consumption, not intoxication to the extent that Hilt's ability to form the requisite intent was impaired. See *Kidd*, 293 Kan. at 595-96 (evidence defendant consumed alcohol from a bottle, made "crazy" statements, may have been " 'buzzed' " insufficient to require voluntary intoxication instruction); *Hernandez*, 292 Kan. at 606-07 (evidence of consumption of alcohol and marijuana, testimony that defendant was high, intoxicated insufficient to require instruction). This evidence was not enough to warrant a voluntary intoxication instruction in this case.

Hilt also argues that the voluntary intoxication instruction was required, because "there was little testimony about Mr. Hilt's state of mind, other than he had been drinking and simply wanted to go home." Evidence of Hilt's state of mind may have been purely circumstantial, even meager, but this does not mean he demonstrated that impairment from alcohol robbed him of his ability to form specific intent. See *State v. Minski*, 252 Kan. 806, Syl. ¶ 3, 850 P.2d 809 (1993); see also *Hernandez*, 292 Kan. at 607 (defendant must show consumption led to impairment of mental faculties). Indeed, other evidence suggests that Hilt was not so intoxicated that he was unable to form specific intent. He was able to direct Alyea to his location in order for her to pick him up. And, about 2 a.m., less than an hour before Alyea's last text message, Hilt entered a convenience store and made a purchase. Nothing in the surveillance video footage from the store suggests that Hilt was impaired.

The district judge did not err when he refused to give the requested voluntary intoxication instruction.

## VOLUNTARY MANSLAUGHTER INSTRUCTION

Hilt next argues that his jury should have been given his requested instruction on voluntary manslaughter.

Our standard of review on this issue matches that applied to the first issue on the aiding and abetting instruction and the immediately preceding issue on the voluntary intoxication instruction.

Because voluntary manslaughter is a lesser included offense of first-degree murder, an instruction on it would have been legally appropriate. See *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008) (voluntary manslaughter lesser included offense of first-, second-degree murder); see also *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012) (same). But a district judge is required to give a legally appropriate instruction only if " 'there is some evidence which would reasonably justify a conviction of [the] lesser included offense.' " *Plummer*, 295 Kan. at 161 (quoting K.S.A. 22-3414[3]).

Voluntary manslaughter, as Hilt argues was potentially applicable here, is the "intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). " 'Sudden quarrel is one form of provocation for "heat of passion" and is not separate and apart from "heat of passion." The provocation[,] whether it be "sudden quarrel" or some other form of provocation[,] must be sufficient to cause an ordinary man to lose control of his actions and his reason.' " *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010) (quoting *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 [1978]).

"We have defined 'heat of passion' as meaning " 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.' " *State v. Vasquez*, 287 Kan. 40, 54, 194 P.3d 563 (2008) (quoting *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 [1985]). The hallmark of heat of passion is taking action upon impulse without reflection." *Wade*, 295 Kan. at 925.

Before the district court, Hilt's counsel argued that "this case had the makings of an extremely emotional, extremely heated quarrel or argument that pops up . . . . [M]aybe Mr. Hilt is angry at [Alyea] at that moment over this quarrel between obviously he and

the victim and the victim's sister over this affair. Maybe that's what is going through his mind." The district judge disagreed, characterizing counsel's argument as speculation. We concur in the district judge's assessment. There was evidence that Hilt and Alyea were riding in her car together and that Alyea engaged in a heated text message exchange with her stepsister about her stepsister's sexual relationship with Hilt. But, even when this evidence is viewed in a light most favorable to Hilt, it simply does not support the development or existence of a sudden quarrel between Hilt and Alyea, much less one that could have caused an ordinary man to lose control of his actions and his reason.

Absent actual evidence to support the lesser included instruction of voluntary manslaughter, the district court did not err in refusing to provide the instruction. It was not factually appropriate. See *Plummer*, 295 Kan. 156, Syl. ¶ 1.

## ADMISSION OF GRUESOME PHOTOGRAPHS

Hilt next challenges the admission of two autopsy photographs. He argues that they were so gruesome as to be unduly prejudicial and that they were cumulative when compared with two other photographs whose admission he does not contest.

" 'The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion.' " *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012) (quoting *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 [2009]). Abuse of discretion also is the standard of review when a party challenges evidence as cumulative. *Rodriguez*, 295 Kan. at 1156 (citing *State v. Dale*, 293 Kan. 660, 663, 267 P.3d 743 [2011]).

The two photographs in issue certainly qualify as gruesome. One, State's Exhibit 83, was taken after the medical examiner had shaved Alyea's head. It shows the blunt-force trauma injury. The other, State's Exhibit 85, shows numerous stab wounds to Alyea's face, head, and neck. The wounds are especially unsightly because of the effect of decomposition and insect damage.

In *Rodriguez*, this court discussed the law applicable to gruesome photographs:

"Photographic evidence, like other evidence offered at trial, is relevant and generally admissible if the photographs have a reasonable tendency to prove a material fact in the case. *State v. Miller*, 284 Kan. 682, 698, 163 P.3d 267 (2007). Although they may sometimes be gruesome, autopsy photographs that assist a pathologist in explaining the cause of death are relevant and admissible. *Riojas*, 288 Kan. at 387; *State v. Decker*, 288 Kan. 306, 309, 202 P.3d 669 (2009); *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004). However, admitting gruesome photographs simply to ' "inflame the minds of the members of the jury" ' is error. *Riojas*, 288 Kan. at 387 (quoting *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 [1975]). We have also often said that admission of unduly repetitious photographs can constitute an abuse of discretion. *State v. Hill*, 290 Kan. 339, 362, 228 P.3d 1027 (2010). The key, as with prejudice, is the word unduly. *Cf. State v. Clark*, 261 Kan. 460, 478, 931 P.2d 664 (1997) (prejudice expected; only undue prejudice reversible). The admission of photographs in a murder case has rarely been held to be an abuse of discretion. *State v. Sappington*, 285 Kan. 176, 195, 169 P.3d 1107 (2007)." 295 Kan. at 1157.

Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. *State v. Burnett*, 293 Kan. 840, 853, 270 P.3d 1115 (2012). "[B]ecause the State has the burden to prove every element of the crime charged, photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant even if the cause of death is not contested." 293 Kan. at 854 (citing *Riojas*, 288 Kan. at 387).

Before trial, the district judge considered the admissibility of Exhibits 83 and 85 during the motion in limine hearing. After looking at the photographs, he concluded that the photographs were "[t]he best evidence" of Alyea's "injuries, how she died, where the injuries are, [and] how they were inflicted." During trial, the medical examiner referenced the two exhibits in order to discuss Alyea's injuries and cause of death. The photographs helped the medical examiner explain why decomposition and insect damage made it difficult to determine the type of blade used in the attack. Although Exhibits 83 and 85 were gruesome, they were not unduly prejudicial. They fit squarely within our rule that such photographs are relevant and admissible when used to help a pathologist explain

what can and cannot be known about the manner and cause of death.

Hilt also challenges the two photographs as cumulative. To the extent he does so, asserting that State's Exhibits 73 and 81 depicted the same injuries, he is incorrect. State's Exhibits 73 and 81 show stab wounds to Alyea's torso; they do not show the injuries she suffered in her face, neck, and head.

Although we have recently cautioned district judges to remember their duty to act as gatekeepers on the admission of gruesome photographs, "especially those that have been rendered more gruesome by the autopsy procedure," *State v. Garcia*, 297 Kan. 182, 197, 301 P.3d 658 (2013), we are persuaded that the district judge presiding over Hilt's trial discharged this duty. There was no error in admitting State's Exhibits 83 and 85.

## PROSECUTORIAL MISCONDUCT

Hilt next asserts on appeal that the prosecutor's closing argument references to *GoodFellas* and "finish[ing] the job" of killing Alyea were reversible misconduct, because they appealed to the jury's emotions and stated facts not in evidence.

This court recently set forth the standard of review for a claim of prosecutorial misconduct in *State v. Ochs*, 297 Kan. 1094, 1099-1100, 306 P.3d 294 (2013):

"We have said that review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012).

"For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors has been individually controlling. *Marshall*, 294 Kan. at 857."

Here, after a brief discussion of the evidence, the prosecutor stated:

"Some of you remember the movie *GoodFellas* where in the movie *GoodFellas*, the gangsters beat up a guy in the restaurant, stick [him] in the trunk, and they are going to go deposit the body. And on the ride in the car, the man starts beating on the trunk. And this is eerily similar to what [the] evidence shows happened in this case. Keighley Alyea was alive in that trunk, and when the defendants discovered or knew that she was alive, at some point in time pulled her out of that trunk and finished the job."

"In closing argument, a prosecutor may draw reasonable inferences from the evidence but may not comment on facts outside the evidence." *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 7, 307 P.3d 1278 (2013). A prosecutor's comments cannot be " 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.' " *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012) (quoting *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]). But a prosecutor may use "analogies, similes, allusions (be they historic, poetic, literary, or scientific), and other rhetorical devices" in an attempt "to bring order to the facts presented at trial, place them in a meaningful context, and out of this collection of bits and pieces construct the whole of a case." *State v. Henderson*, 32 Kan. App. 2d 1202, 1210, 96 P.3d 680 (2004).

Within sensible limits set by similarity and dissimilarity to the facts of a case, a prosecutor's appropriate rhetorical devices may include film allusions and comparisons or be otherwise theatrical. See *State v. Anthony*, 282 Kan. 201, 211, 145 P.3d 1 (2006) (comparing defendant to "man behind the curtain" in *The Wizard of Oz* did not exceed bounds of legitimate rhetoric when responsive to defense argument questioning thoroughness of police investigation of murder); see also *State v. Rodriguez*, 269 Kan. 633, 642-44, 8 P.3d 712 (2000) (prosecutor's comparison of defendant to magician creating " 'big puff of smoke' " to divert jury's attention from acceptable argument); *State v. Duke*, 256 Kan. 703, 718, 887 P.2d 110 (1994) (prosecutor's description of defense counsel's argument as " 'smoke and mirrors' " not error); but see *State v. Greer*, No. 89,004, 2003 WL 23018227, at *3-4 (Kan. App. 2003) (unpublished opinion) (prosecutor's comparison of defendant to Jack Nicholson character in *The Shining* improper), *rev. denied*

277 Kan. 926 (2004); accord *United States v. Kincannon*, 567 F.3d 893, 900 (7th Cir. 2009) (dicta suggesting comparison of defendant to *The Godfather*'s Michael Corleone "would be utterly unmoored from the record"); but see *State v. Blanks*, 479 N.W.2d 601, 605 (Iowa App. 1991) (error for prosecutor to reference *Gorillas in the Mist* to illustrate point during closing argument; racial overtones, closeness of movie's plot to circumstances surrounding alleged crime unfairly prejudicial; "[b]y his allusion, the prosecutor brought before the jurors a myriad of other factors not previously present").

In this case, Hilt asserts that the prosecutor's analogy to *GoodFellas* was inappropriate because there was no evidence that Alyea beat on the inside of the trunk. He further suggests that Hilt and the other men may not have "finished the job" of killing her after removing her from the trunk because she may already have bled to death.

Hilt's argument ultimately is unpersuasive. Although the reference to beating on the inside of the trunk tread close to the line, the prosecutor did not say that Alyea's final moments of life were exactly the same as those of the unfortunate character in *Good-Fellas*. The prosecutor said only that they were "eerily similar." The evidence supported the prosecutor's statement because the facts of the movie were similar in significant respects to those before the jury, and drawing the jurors' attention to the likeness between an iconic film with which they may be familiar and the case just presented to them brought order to the facts and placed them in the meaningful context of the prosecution's theory of the case.

Among those facts were those that demonstrated Alyea was alive for at least some period of time in the trunk. The order of events—bloody wound, trunk transport, removal from trunk, dumping of body—was similar to that in *GoodFellas*, regardless of whether Alyea was still alive when taken from the trunk. The parties did not dispute that the taillight assemblies for Alyea's car had been taken apart and disconnected, although they were intact shortly before the night of the murder. There also was no dispute that the connectors were smeared with blood, making it apparent that the person who took them apart from inside the trunk was bleeding at

the time. The trunk latch also had a smear of blood on it. The inference the prosecutor suggested the jury could draw from these pieces of evidence—that Alyea did not die while inside the trunk but was wounded and then lived long enough to be removed from the trunk and killed—was just as plausible as the inference Hilt advances—that she died while inside the trunk.

We hold that the prosecutor remained within the wide latitude allowed in discussing the evidence during closing argument. Because we detect no misconduct in the comments about which Hilt complains, we need not consider whether any error arising from misconduct was harmless.

### CUMULATIVE ERROR

Hilt's last appellate challenge to his convictions is that cumulative error denied him a fair trial.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013) (citing *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 [2009]). " 'Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant.' [Citations omitted.]." *Novotny* 297 Kan. at 1191 (quoting *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 [2009]).

Because Hilt has not demonstrated the existence of two or more trial errors not individually reversible, the cumulative error doctrine is inapplicable.

### HIGH SENTENCES IN GRID RANGE

Hilt's first sentencing challenge attacks the district judge's decision to give him the high sentence in the Kansas Sentencing Guidelines Act grid range for each of his aggravated kidnapping and aggravated robbery convictions.

"The interpretation of a sentencing statute is a question of law over which this court exercises unlimited review." *State v. Ardry*, 295 Kan. 733, 735, 286 P.3d 207 (2012).

Hilt recognizes that this court has previously decided that it lacks jurisdiction to consider this issue. See *State v. Johnson,* 286 Kan. 824, Syl. ¶ 6, 190 P.3d 207 (2008) (under K.S.A. 21-4721[c][1] appellate court without jurisdiction to consider challenge to presumptive sentence, even if highest term in presumptive grid block handed down). He raises it only to preserve it for federal review.

We do not revisit our previous ruling today.

## Hard 50 Life Sentence for Murder

Hilt was given a hard 50 life sentence for first-degree murder under K.S.A. 21-4635(b), which was in effect at the time of Alyea's 2009 killing. (The statute was later recodified, with no substantive change, at K.S.A. 2013 Supp. 21-6620[b]; but we will continue to refer to it as K.S.A. 21-4635[b] in this opinion.) The district judge stated that the aggravating factors in Hilt's case "far outweigh[ed] any mitigating circumstances."

In his opening brief, Hilt challenged the constitutionality of his hard 50 life sentence. While his case was awaiting oral argument before this court, on June 17, 2013, the United States Supreme Court decided *Alleyne v. United States,* 570 U.S. \_\_\_\_, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). We then ordered the parties to provide supplemental briefing on the hard 50 life sentence in light of *Alleyne* and any applicable statutory amendments. Later, we ordered additional supplemental briefing on whether any hard 50 sentencing error was subject to harmlessness review and, if so, how that review should be conducted in this case.

In response to our orders, Hilt continues to maintain that his hard 50 life sentence was unconstitutional when imposed. He further argues that the State has abandoned any claim that the error was harmless; that harmlessness analysis is both generally and specifically inappropriate; and that, if harmlessness analysis is performed, it compels a holding that the error was not harmless here because the State's evidence was insufficient to prove the existence of the aggravating circumstances beyond a reasonable doubt.

The State argues that Kansas' hard 50 sentencing scheme does not run afoul of *Alleyne.* Should we agree with Hilt rather than the State on that point, the State argues the error is subject to harm-

lessness analysis and, in fact, was harmless in this case. If this court instead holds that Hilt's hard 50 sentence must be vacated, the State argues that September 2013 amendments to the hard 50 sentencing scheme can be applied to Hilt on remand to make him eligible for reimposition of a hard 50. Hilt, of course, disagrees.

For reasons we explain below, we address the constitutionality and harmlessness questions today and decline to address the question of whether the amended statute can be applied to Hilt on remand.

*Constitutionality*

The constitutionality of a sentencing statute raises a question of law over which this court exercises unlimited review. *State v. Huerta-Alvarez*, 291 Kan. 247, 254, 243 P.3d 326 (2010).

In *Alleyne*, the Court extended the rule it announced in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), holding that "any fact that increases the mandatory minimum [sentence] is an 'element' that must be submitted to the jury" and proved beyond a reasonable doubt. 133 S. Ct. at 2155, 2158.

As we have recently recognized in *State v. Soto*, 299 Kan. 102, 128-29, 322 P.3d 334 (2014), the *Alleyne* holding controls here. The statutorily authorized maximum sentence for Hilt's first-degree premeditated murder conviction is life imprisonment. K.S.A. 21-4706(c). Except as provided in the hard 50 sentencing scheme, an inmate sentenced for the crime of first-degree premeditated murder must serve 25 years of that life sentence before he or she is eligible for parole. See K.S.A. 2013 Supp. 22-3717(b)(1). And the minimum term that must be served before an inmate serving a life sentence is eligible for parole generally has been characterized as a mandatory minimum sentence. See, *e.g.*, *State v. Wilson*, 294 Kan. 818, 820, 280 P.3d 784 (2012) (suggesting mandatory minimum sentence under Jessica's Law is 25 years' imprisonment); *State v. Warledo*, 286 Kan. 927, 955, 190 P.3d 937 (2008) ("In determining whether to impose a hard 50 sentence, the sentencing court is considering the minimum sentence, not the maximum."); *Johnson*, 284 Kan. at 23 ("The maximum sentence for first-degree

murder is life in prison. The hard 50 sentence enhances the minimum sentence which must be served and does not expose a defendant to a higher maximum sentence than provided by statute."); see also *Conley*, 270 Kan. at 33 (a hard 40 sentence does not increase maximum penalty; "it simply limits the lower end of the sentence").

Were it not for the sentencing judge's finding by a preponderance of the evidence of four aggravating factors, Hilt would not have faced a minimum sentence of 50 years rather than 25 years for Alyea's murder. Because the judge, rather than the jury, found the four aggravating factors existed, and did so on a preponderance-of-the-evidence rather than a beyond-a-reasonable-doubt standard, Hilt's Sixth Amendment right to a jury trial, as interpreted in *Alleyne*, was violated. See *Soto*, 299 Kan. at 129.

The State attempts to save Hilt's hard 50 sentence by arguing that Kansas requires an exercise of judicial discretion in imposing the hard 50 because aggravating circumstances and mitigating circumstances must be weighed before the mandatory minimum sentence is imposed. The State is correct that the federal statute under consideration in *Alleyne* provided for no such weighing; if a gun was brandished, then the mandatory minimum followed automatically from the existence of that aggravating circumstance. See 18 U.S.C. 924(c)(1)(A)(ii) (2012). The State also is correct that *Alleyne* explicitly recognized that not all facts influencing judicial discretion need be found by a jury because "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." 133 S. Ct. at 2163.

But success on the State's argument distinguishing the statute at issue in *Alleyne* depends upon our willingness to agree that the weighing done by a Kansas judge is a discretionary endeavor rather than yet another episode of unconstitutional factfinding. We need not address that issue here, because, in Hilt's case, the statute had already permitted four episodes of impermissible judicial factfinding before any weighing occurred. When the district judge found that the four aggravating circumstances existed—infliction of mental anguish or physical abuse before Alyea's death; torture of Alyea;

continuous acts of violence begun before or continuing after the killing of Alyea; and especially heinous, atrocious, or cruel conduct by Hilt—the constitutional damage was already done. The mere judge-decided existence of the aggravating factors created the potential for an increased penalty, *i.e.*, the potential for a mandatory minimum of 50 years rather than 25. See *Alleyne*, 133 S. Ct. at 2162 ("When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury.").

*Alleyne* requires us to hold that Hilt's hard 50 sentence for first-degree murder violated his Sixth Amendment rights.

*Harmlessness*

We next address whether the constitutional error in sentencing Hilt to a hard 50 can be labeled harmless.

The question of whether harmlessness analysis applies is discussed in our decision in *Soto*, 299 Kan. at 124-26. In *Soto*, we note that this court has recognized that *Apprendi*-type error can be harmless when we are able to say that an element left out of a jury instruction was nevertheless supported by overwhelming evidence such that the jury verdict would have been the same absent the error. See 299 Kan. at 124. A majority of this court applied that rule in *State v. Reyna*, 290 Kan. 666, 679-82, 234 P.3d 761 (applying framework from *Neder v. United States*, 527 U.S. 1, 8, 9-16, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999], to hold failure to instruct jury to find element of defendant's age of 18 or older harmless in Jessica's Law case, even though age exposes defendant to mandatory minimum sentence; defendant testified to his age of 37), *cert. denied* 131 S. Ct. 532 (2010).

As in *Soto*, we assume without deciding that harmlessness applies. But we cannot say on the record before us that (1) proof of the aggravators was so overwhelming that their existence was certainly established, and (2) no rational factfinder would decide beyond a reasonable doubt that the mitigators advanced by Hilt outweighed the State's aggravators. See 299 Kan. at 127 (citing K.S.A. 21-4635(d); *State v. Ring*, 204 Ariz. 534, 565, 65 P.3d 915 (2003).

At the same time, we do not agree with Hilt that the evidence of the aggravators was insufficient as a matter of law, making remand inappropriate. See *Soto*, 299 Kan. 127-28. The evidence supporting an inference that Alyea was alive and bleeding inside the trunk could alone be adequate to support the existence of infliction of mental anguish or physical abuse before her death, one of the aggravators.

In short, this case is not one of the rare instances when a hard 50 *Alleyne* error can be declared harmless. Neither is it a case where proof of the aggravators was so weak that it should be labeled insufficient and prevent the State from seeking a hard 50 sentence on remand. Hilt's hard 50 life sentence is vacated and this case is remanded to the district court for resentencing.

*Applicability of Amended Hard 50 Statute on Remand*

In response to *Alleyne*, our legislature amended the hard 50 statute in a special session in 2013. The amended statute includes the following language, which became effective September 6, 2013:

"[F]or all cases on appeal on or after the effective date of this act, if a sentence imposed under this section, prior to amendment by this act, or under K.S.A. 21-4635, prior to its repeal, is vacated for any reason other than sufficiency of the evidence as to all aggravating circumstances, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence." K.S.A. 2013 Supp. 21-6620(e).

The parties in this case disagree on whether the amended statute may be applied to Hilt on remand. Hilt argues that application would violate the federal Constitution's prohibition on ex post facto laws. The State argues that the amendment was procedural rather than substantive, that its retrospective application to defendants in Hilt's position was the inescapable intention of the legislature, and that the amended statute does not alter the definition of Hilt's criminal conduct or increase the penalty by which that crime is punishable. Thus, in the State's view, application of the amended statute to Hilt would not violate the constitutional prohibition on ex post facto laws.

As in *Soto*, after careful consideration, we have determined that this is not the case in which we should decide the merits of the ex

post facto issue. See *Soto*, 299 Kan. at 128-29. The amended statute has not been applied to impose a hard 50 sentence on Hilt at this point. Its meaning and the presence or absence of an ex post facto effect have not been fully litigated. It is possible that no hard 50 sentence will be handed down on remand. Moreover, this court is not in the habit of issuing advisory opinions. See *State v. Montgomery*, 295 Kan. 837, Syl. ¶ 2, 286 P.3d 866 (2012).

## CONCLUSION

We affirm Hilt's district court convictions for first-degree premeditated murder, aggravated kidnapping, and aggravated robbery. We vacate his hard 50 life sentence for the murder and remand this case to the district court for resentencing on that conviction.