IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,573

STATE OF KANSAS,
*Appellee*,

v.

DANIEL BARLETT,
*Appellant*.

SYLLABUS BY THE COURT

1.

A defendant may not assert self-defense if the accused is already otherwise committing a forcible felony when he or she commits a separate act of violence, i.e., in purported self-defense.

2.

A self-defense instruction is not available when the parties are engaging in mutual combat. Mutual combat occurs when both parties enter into the combat willingly or voluntarily and implies a common intent to fight. It does not matter which party initiated the confrontation when both parties willingly engaged in it.

3.

A jury instruction must be both legally and factually appropriate.

Review of the judgment of the Court of Appeals in an unpublished opinion filed May 13, 2016. Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed June 8, 2018. The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.

1

*Samuel Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Daniel Obermeier*, assistant district attorney, argued the cause, and *Sheryl L. Lidtke*, chief deputy district attorney, *Jerome A. Gorman,* district attorney, and *Derek Schmidt,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Daniel Barlett appeals from his conviction by a jury for one count of criminal discharge of a firearm into a vehicle under a theory of aiding and abetting.

FACTUAL AND PROCEDURAL BACKGROUND

At trial, the witnesses presented varying and sometimes conflicting versions of the context that led to this prosecution. We have pared down the factual background to what we deem important for resolution of the issues.

Around 2007, Barlett and Chad Ford formed a rap group called Wicked Wayz. Unable to agree on finances, Barlett and Ford ended their venture in 2010 or 2011. Barlett continued to perform under the name Wicked Wayz. The breakup was acrimonious, and the two men disparaged each other in social media and in their musical performances.

Ford and Stephen Carson, a member of the Wicked Wayz performing group, had a chance encounter in the Kansas City municipal courthouse on the morning of September 24, 2012. Either Ford or Carson said to the other man, "I got something for you." Ford called his friends Billy Castle and Ross Farber and asked them for assistance in

2

confronting Carson. Castle drove to the courthouse to provide protection for Ford. Farber arrived at the courthouse parking lot with a .38 revolver and a 9 mm pistol in his car "to even the odds" if a gunfight were to ensue.

They were joined in the parking lot by Teresa Ford, who is Barlett's sister and was Ford's wife. Soon thereafter, they saw Carson and Joey Uziel pulling out of the parking lot in a white Buick. Ford and Farber ran to the car, screamed at Carson, and forced the passenger door open. Farber spat on Carson while Ford grabbed Carson's foot and attempted to drag him out of the car. Carson was able to shut the door, and Uziel drove the two of them away at high speed.

Carson made several phone calls to Barlett, who got out of bed and woke up Mikey McKeehan, who was staying at his house. Barlett told McKeehan, "Mikey, wake up. Joe and Stephen is being chased by Chad and them, and they have guns." McKeehan and Barlett left in Barlett's car to find and back up Carson. McKeehan took his 9 mm pistol with him, because he was concerned about his safety in case there was a gunfight. Barlett's niece, Jessica Bryant, testified that Barlett's wife, Courtney Wilcox, told her over the phone that she should hurry over to the house, "because Daniel and Mikey just left armed to go get Chad."

Ford, his wife, Farber, and Castle agreed to meet at another parking lot, where Ford and Farber got in Castle's black Chevy Blazer. Ford rode in the front passenger seat, and Farber rode in the back. Farber brought his handguns with him.

As they drove toward Castle's house, Ford noticed Uziel and Carson's Buick. They started to follow the Buick, and Ford yelled out the window that Uziel should pull over. While Castle pursued Uziel, they passed Barlett and McKeehan coming the opposite direction. Barlett executed a U-turn and began to drive up behind Castle's car. Castle

3

noticed Barlett quickly approaching from the rear. Ford was hanging out the window, flipping off Barlett and McKeehan and screaming at Carson and Uziel. Uziel took a left fork in the road, and Castle took the right fork, closely followed by Barlett. Barlett pulled his car up beside Castle's car, and Castle swerved in an attempt to ram Barlett's car. Barlett swerved to avoid him and applied the brakes so that he fell behind Castle's car.

Testimony was conflicting as to what happened next. McKeehan testified that Ford was leaning out his car window with a gun in his hand, which was when McKeehan pulled out his gun and aimed it out the window toward Castle's car. According to Barlett's testimony at the preliminary hearing, Ford fired two shots toward his car. At the preliminary hearing, Farber testified that Ford had fired two shots toward Barlett and McKeehan, although he could not confirm that with certainty at the trial.

According to McKeehan, after Ford started shooting, Barlett told McKeehan to shoot back. McKeehan emptied his 15-round clip in the direction of Castle's car. Castle testified that, as Barlett drove alongside Castle's car, he heard a gunshot, and more shots were fired a few seconds later. Ford then asked Farber for a gun. Farber gave Ford a revolver, and Ford leaned his body out the window while displaying the gun. He almost immediately fell back into the car. An autopsy would later show that Ford died almost instantly from a gunshot wound to the head. Ford's revolver dropped onto the street. Barlett stopped his car, and McKeehan got out and picked Ford's gun up off the street.

Barlett and McKeehan both left town, and both subsequently turned themselves in to police after a day or two. McKeehan cleaned Ford's and his own guns and later turned them over to the police.

On September 25, 2012, the State charged Barlett and McKeehan with felony murder and criminal discharge of a firearm. The first attempt at prosecution of Barlett

4

ended in a mistrial because of the bad health of Barlett's trial counsel. A new trial commenced on March 10, 2014. McKeehan, having pled guilty to second-degree murder, firing into an occupied vehicle, and counts of aggravated assault, testified for the State at the second trial.

The jury found Barlett guilty of criminal discharge of a firearm but split on the felony-murder charge, with seven jurors voting to convict and five voting to acquit. On April 25, 2014, the State agreed to reduce the felony-murder charge to voluntary manslaughter in exchange for Barlett's plea of guilty. The court ordered the manslaughter sentence and the firearm sentence to run consecutive, imposing a controlling sentence of 106 months for the two convictions.

The Court of Appeals affirmed the criminal discharge of a fireman conviction in *State v. Barlett*, No. 112,573, 2016 WL 2772842 (Kan. App. 2016) (unpublished opinion). We granted Barlett's petition seeking review of five issues that he raised to the Court of Appeals. Neither party sought review of issues regarding alleged prosecutorial error and an assertion that Barlett waived appellate review through a plea agreement for manslaughter, and those issues will not be addressed here. See *State v. Perry*, 303 Kan. 1053, 1054, 370 P.3d 754 (2016) (issues not raised by petition for review deemed waived and not appropriate for review).

ANALYSIS

*The Self-Defense Instruction*

Barlett requested an instruction on self-defense, which the district court denied. The Court of Appeals, relying on both statutory language and precedent from this court, held that the instruction was legally inappropriate in this case because Barlett was

5

charged with a violent felony, which prevented him from asserting a theory of self-defense. *Barlett*, 2016 WL 2772842, at \*4.

K.S.A. 2017 Supp. 21-5223 allows an individual to use deadly force when the person reasonably believes that such force is necessary to protect one's occupied vehicle. K.S.A. 2017 Supp. 21-5226(a) precludes the use of such deadly force by anyone who is "attempting to commit, committing or escaping from the commission of a forcible felony." K.S.A. 2017 Supp. 21-5111(n) defines a "forcible felony" to include "any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and any other felony which involves the use or threat of physical force or violence against any person."

This court has used the 21-5226 language (as well as the language of the earlier version of the statute, K.S.A. 21-3214) to bar asserting self-defense when the defendant has been charged with any forcible felony, such as criminal discharge of a firearm. In *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), *disapproved on other grounds by State v. Anderson*, 287 Kan. 325, 197 P.3d 409 (2008), this court held that a defendant charged with a forcible felony could not rely on a theory of self-defense. Justice Davis, writing for a unanimous court, concluded:

> "Criminal discharge of a weapon at an occupied vehicle, the underlying felony in this case, is considered a forcible felony. [Citation omitted.] As the defendant was charged with the forcible felonies of first-degree murder and criminal discharge of a firearm at an occupied vehicle, he was excluded from a self-defense instruction by K.S.A. 21-3214(1)." *Bell*, 276 Kan. at 793.

In *State v. Kirkpatrick*, 286 Kan. 329, 184 P.3d 247 (2008), this court reaffirmed the holding of *Bell* and included criminal discharge of a firearm at an occupied building in the category of forcible felonies precluding a self-defense instruction.

6

The majority of the *Kirkpatrick* court relied on *Bell* and the plain language of K.S.A. 21-3214(1), which provides that self-defense is not available when a defendant is attempting to commit or is committing a forcible felony. 286 Kan. at 335-36. The court deemed the situation similar to that in *Bell*: criminal discharge of a firearm into a building is just as much of a forcible felony as criminal discharge of a firearm into an automobile. 286 Kan. at 337. The majority appeared to structure its conclusion around the specific facts of the case, arguing that the evidence supporting self-defense was not compelling and therefore injustice would not result from the *Bell* rule. 286 Kan. at 338.

In an extensive dissenting opinion, Justice Nuss, joined by Justice Beier, identified several infirmities in the majority analysis. See 286 Kan. at 356. The author of this opinion agreed with the dissent's argument that the instruction was legally appropriate. See 286 Kan. at 369. We reiterate several of the points raised in the dissent and concurrence.

First, we note that the *Kirkpatrick* majority's reading ironically removed self-defense from the defenses that could be raised to violent actions if those actions were charged as felonies. If a defendant is charged with murder, then the defense is not available because the defendant was charged with committing a forcible felony. As the dissent explained, the majority effectively eliminated "self-defense for most of the very crimes for which that defense was developed over the centuries." 286 Kan. at 358. The result was that when a defendant claimed he or she was shooting in self-defense, the majority barred his or her claim of self-defense simply because he or she shot into an occupied building, even though he or she shot into the occupied building in order to defend himself or herself.

7

The dissent argued that "the legislature never contemplated that if a particular act of self-defense was the same act constituting the commission of the purported forcible felony, that the self-defense claim would be barred, neatly clearing the way for a nearly trouble-free prosecution." *Kirkpatrick*, 286 Kan. at 360.

In the dissent's view, the statutes in question were designed to bar asserting self-defense "only if the accused is *already* otherwise committing a forcible felony when he or she commits a separate act of violence, *i.e.*, in purported self-defense." *Kirkpatrick*, 286 Kan. at 361-62. The dissent referred to several cases supporting its position. For example, in *State v. Alderson*, 260 Kan. 445, 922 P.2d 435 (1996), the defendant was allowed to present a self-defense theory when he fired shots into a car that nearly hit the defendant's friend and was heading toward the defendant. The self-defense instruction was given despite a large amount of evidence contrary to the defendant's version.

*Bell* and *Kirkpatrick* were issued before this court decided on a progressive analysis of assertions of instructional error. In *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012), we sought to clarify and make consistent the standards for reviewing such issues. We adopted a four-step progressive analysis:

> "[F]or instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *Ward.*" *Plummer*, 295 Kan. at 163.

8

*Bell* and *Kirkpatrick* seem to have intermingled several of the analytic steps, resulting in a statement of law that should have been considered specific to those cases rather than serving as a general rule.

Applying the *Plummer* analysis to the present appeal, we initially conclude that there is no challenge to the reviewability of the issue. We next determine whether a self-defense instruction would have been legally appropriate. We conclude that the general rule stated in *Bell* and *Kirkpatrick*—that a defendant charged with committing a forcible felony is not permitted to assert a theory of self-defense—is overly broad and is inconsistent with both the intent of the Legislature and with other opinions of this court. The better rule is the one we adopt today: a defendant may not assert self-defense if that defendant is already otherwise committing a forcible felony when he or she commits a separate act of violence. Under this newly articulated rule, the requested instruction was legally appropriate.

This is not, however, the end of the inquiry. We must also decide whether the evidence was factually appropriate. We conclude that it was not.

This court has held that a self-defense instruction is not available when the parties are engaging in mutual combat. Mutual combat occurs when both parties enter into the combat willingly or voluntarily; it implies a common intent to fight. It does not matter which party initiated the confrontation when both parties willingly engaged in it. *State v. Friday*, 297 Kan. 1023, 1038, 306 P.3d 265 (2013). Barlett and McKeehan left their house with the intention of "getting" Ford. Barlett was driving his car in an aggressive manner near Castle's car (as Castle had initially driven aggressively in pursuit of Uziel). The parties were exchanging insults as they drove. The situation was clearly hostile and confrontational, a situation into which Barlett freely inserted himself and McKeehan.

Barlett argues that he had a legal right to drive next to Castle and that he had no legal duty to retreat. One may engage in behavior that does not violate a law but that promotes and escalates violent tensions so as to vitiate claims of self-defense. The record in the present case shows that the individuals in all three cars were spoiling for a fight, and the escalating tensions precluded a self-defense instruction.

We conclude that the district court properly denied the request for an instruction on self-defense.

*The Mere Association Instruction*

Barlett requested an instruction informing the jury that mere association with the principals or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor. The district court deemed the aiding and abetting instruction sufficient to inform the jury what the elements of the crime were and denied the request. As with the previous issue, Barlett asks that this court depart from earlier rulings and find error in the failure to instruct explicitly on mere association.

Barlett proposed an instruction based on *State v. Llamas*, 298 Kan. 246, 261, 311 P.3d 399 (2013) (better practice is to include mere association or presence language in instructions). The proposed instruction read:

"RESPONSIBILITY FOR CRIMES OF ANOTHER
"Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abetter. To be guilty of aiding and abetting in the commission of the crime the defendant must willfully associate himself with the unlawful venture and willfully participate in it as he would something he wishes to bring about."

The district court denied the request, giving instead the standard aiding and abetting instruction. That instruction read:

> "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises, counsels, or procures another to commit the crime."

We have held that the standard instruction suffices, but, in recent decisions, have recommended providing additional instructions to clarify that the mere presence at a crime or mere association with the principal does not suffice to establish the mental culpability as an aider and abettor. Shortly after issuing *Llamas*, we again addressed the question in *State v. Hilt*, 299 Kan. 176, 185-86, 322 P.3d 367 (2014). We reached the same conclusion—that giving the PIK instruction on aiding and abetting, given without additional language on presence or association, is not reversible error. We added, however, that "the better practice is to add the requested language in cases such as this, and failure to do so may imperil convictions in future similar cases. [Citation omitted.]" 299 Kan. at 185-86.

In *State v. Carter*, 305 Kan. 139, 165, 380 P.3d 189 (2016), we reiterated the admonitions of *Llamas* and *Hilt* but held that those two cases were dissimilar because the additional language would have been "factually inappropriate." This was because, according to the defendant's own testimony, he was not merely present or associated with the principal. "He actively participated in chasing and accosting and beating [the victim]. He denied knifing him. But he was far more than one who innocently found himself in the wrong place with the wrong person at the wrong time." 305 Kan. at 165.

11

Barlett urges this court to put teeth into *Llamas* and *Hilt*, making the mere presence language mandatory in cases where it is factually appropriate and reversing for a new trial.

Here, as in *Carter*, the facts do not support the requested instruction. Barlett quite clearly did not just happen to be riding with McKeehan when the shooting broke out. Barlett woke McKeehan up and told him they had to go together to protect Carson and that McKeehan should bring a firearm along for protection. Barlett drove the car in pursuit of Castle's car and continued to pursue it after Carson and Uziel turned away. According to McKeehan, Barlett told him to "do it," i.e., to shoot, when Barlett saw Ford's gun. Even if the shooting was a reaction to something that Ford did, Barlett was not out for a leisurely drive and he did not just happen to be present when his passenger started shooting into another car.

Although we continue to recommend the mere presence or association instruction when it is supported by the facts, the instruction would not have been appropriate in the present case.

*Intentional Conduct Instruction*

Although he did not object to the omission at trial, Barlett contends on appeal that the district court committed clear error when it omitted a statutory definition of intentional conduct from the jury instructions. When, as in the present case, a party fails to preserve an instructional issue by raising it to the district court, the failure to give such a jury instruction is reviewed for clear error. In order to reverse for clear error, this court must be firmly convinced, after reviewing the record to determine that the instruction was legally and factually appropriate, that the jury would have reached a different verdict had

12

the instruction error not occurred. *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015).

Instruction No. 7 explained reckless criminal discharge of a firearm at an occupied vehicle:

"The State must prove the defendant committed the crime of Criminal Discharge of a Firearm at an Occupied Vehicle recklessly.

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist or a result of the defendant's actions will follow.

"This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

Instruction No. 10 explained vicarious criminal liability:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises, counsels, or procures another to commit the crime."

K.S.A. 2017 Supp. 21-5202(h) defines intent:

"A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result."

PIK Crim. 4th 52.010 incorporates this language.

13

Barlett maintains on appeal that the district court committed clear error when it failed to provide the jury with the statutory definition of intentionality. The Court of Appeals analyzed the issue in terms of the intent required under a theory of aiding and abetting, concluding that the instruction was not warranted in this case. The court also deemed any error to be harmless because the legal definition of "intentional" is essentially the same as the common meaning of the word, which would be familiar to the lay jury. *Barlett*, 2016 WL 2772842, at *7.

We agree with the analysis developed by the Court of Appeals and see no reason to expand on it or modify it. We find no grounds for reversal with respect to this issue.

*Malfunctioning Electronic Equipment*

The apparatus for replaying evidence malfunctioned when the jury asked to review the electronic recording during deliberations. Alleging prejudice, Barlett filed a motion for new trial, which the district court denied. The court instead provided the jury with a transcript of the unplayable portion. The Court of Appeals affirmed the denial.

Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if prejudicial conduct inside or outside the courtroom makes it impossible for the trial to proceed without injustice to either party. The statute creates a two-step process. First, the district court must determine whether there was some fundamental failure of the proceeding. If there was, the district court moves to the second step and assesses whether it is possible to continue without injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of

prejudice results in an injustice and, if so, declare a mistrial. *State v. McCullough*, 293 Kan. 970, 980, 270 P.3d 1142 (2012).

Appellate courts review a district court's ruling on a motion for mistrial for an abuse of discretion. Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable. The abuse of discretion inquiry is divided into two parts:  did the district court abuse its discretion when deciding whether there was a fundamental failure in the proceeding, and did the district court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? *McCullough*, 293 Kan. at 980-81.

During Barlett's second trial, the State attempted to play a DVD recording containing his statements to the police. Because of a software issue, the State was unable to play almost half of the recording. The State proposed to have the transcript of the interrogation read to the jury, with the role of Barlett played by the prosecutor and the role of the interrogators played by a witness who was a detective. Barlett objected, arguing that the presentation would be prejudicial because the jury would not be able to consider Barlett's inflection or visual cues. The court stated that prejudice was unlikely because the jury had seen enough of the recording to have a sense of the participants' demeanors and tones and because defense counsel could cross-examine the witness about the tone.

The State then proposed an alternative solution:  that the jury be provided with a transcript of the portion of the interrogation that it had already viewed as well as the portion that could not be played. Barlett renewed his objection, arguing that a bifurcated presentation of the evidence—half a recording play-back, and half a transcript—could mislead the jury about the tone of the second half of the interrogation, causing prejudice. The court overruled the objection and ruled that the transcript would be provided to the

15

jury for its deliberations. The digital recording would be provided to the jury only if it specifically requested it.

During deliberations, the jury asked to view the recorded interrogation. The court ruled that the jury would be provided with the equipment to watch the DVD up to the point where it stopped playing during the trial. When the jury attempted to view the interrogation, the equipment failed to play portions of the recording that had played earlier at trial. Barlett then moved for a mistrial. He argued that it was obviously important to the jury to view the recording because it already had a written transcript. The State responded that the jury had already seen the part of the recording that was in question and Barlett could identify no actual prejudice from the equipment failure. The district court overruled the motion, holding that no discernable prejudice would result from the jury relying on the transcript.

On appeal, Barlett contends that the failure to satisfy the jury's request to watch the entire video recording that it had seen earlier at trial constituted a fundamental failure in the proceedings, requiring reversal.

K.S.A. 2017 Supp. 22-3420(c), which was in effect at the time of Barlett's trial, provides that, in the district court's discretion, "upon the jury's retiring for deliberation, the jury may take any admitted exhibits into the jury room, where they may review them without further permission from the court. If necessary, the court may provide equipment to facilitate review."

The earlier version of the statute, in effect when the shooting occurred, read:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct

16

them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." K.S.A. 22-3420(3) (Torrence 2007).

Barlett contends that this language is mandatory, and the failure of the district court to replay the recording in its entirety defeated the statutory requirement, resulting in a fundamental failure in the proceedings. The Court of Appeals correctly noted that the change in statutory language was procedural and the current statutory form governed the trial. See, e.g., *State v. Brownlee*, 302 Kan. 491, 509-10, 354 P.3d 525 (2015) (procedural amendments may be applied retroactively; substantive amendments apply only prospectively); *State v. Hutchison*, 228 Kan. 279, 287, 615 P.2d 138 (1980) (procedural amendments provide, regulate steps by which punishment for criminal act meted out; substantive amendments declare specific acts crimes, prescribe punishment).

It does not matter which statute version is in play here. The jury requested that it be allowed to review earlier testimony, and it was given that opportunity, although a portion of the earlier testimony was provided in the form of a transcript instead of an electronic recording. The means by which a district court complies with a jury request for review of evidence presented at trial lies within the discretion of the court. *State v. Myers*, 255 Kan. 3, 6, 872 P.2d 236 (1994) (construing K.S.A. 22-3420[3] [Torrence 2007]). In *State v. Boyd*, 257 Kan. 82, 891 P.2d 358 (1995), the jury requested to view the written transcript of some testimony, but the court provided only a selective reading of the requested materials. This court determined there was no prejudicial error and no infringement on the defendant's fundamental rights. 257 Kan. at 90-91. It found that the *form* of the district court's response to the jury's requests was adequate and there was no abuse of discretion. 257 Kan. at 91.

17

In the present case, the objection raised at trial was based on prejudice. The objection raised on appeal is violation of an asserted statutory mandate. Under either theory, however, there is no apparent error. Barlett points to nothing in the recording where a reading of the transcript might have misled the jury; in fact, he does not argue prejudice on appeal. This court has held that the means or form of responding to a jury's request to review evidence is discretionary, not mandatory.

The district court did not abuse its discretion when it decided that the equipment failure did not produce a fundamental procedural failure. There was no error. Furthermore, any asserted prejudice was cured or mitigated by allowing the jury access to the full transcript.

*Cumulative Error*

Barlett finally argues that the cumulative effect of trial errors deprived him of a fair trial, but, when there is no error, there can be no errors to contribute to cumulative error and there is no basis for reversal. See *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017).

CONCLUSION

Subject to a revised standard for providing a requested self-defense instruction, the opinion of the Court of Appeals is affirmed. The judgment of the district court is affirmed.