NOT DESIGNATED FOR PUBLICATION

No. 117,254

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS WAYNE FAGLIE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed July 13, 2018. Affirmed in part, reversed in part, sentence vacated, and remanded with directions.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Jonathan Ogle*, assistant county attorney, *Amy L. Aranda*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., BUSER and ATCHESON, JJ.


BUSER, J.:  Nicholas Wayne Faglie appeals his conviction for aggravated battery. He raises two issues on appeal. First, Faglie contends the district court erred when it denied his request for a self-defense jury instruction. Second, Faglie claims that incriminating statements he made to a law enforcement officer should have been suppressed because he was not informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

1

Upon our review, we hold the district court erred by denying Faglie's request for a self-defense jury instruction and, as a result, we reverse the conviction, vacate the sentence, and remand with directions. We also hold the district court did not err in denying Faglie's motion to suppress his incriminating statements. That ruling is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

On January 25, 2016, Kristopher Schultz was at Charlie's Place, a bar in Emporia, Kansas. Schultz' friend, Christopher Walburn, was drinking with him in the bar. Faglie also went to Charlie's Place that night with his friend, Dustin Dingman. During the evening, the four men—Schultz, Walburn, Faglie, and Dingman—were drinking shots and other alcoholic beverages at the bar. The bartender noticed some arguments between the men, but she did not believe they were serious and she thought they had been resolved.

Eventually, Schultz and Walburn exited Charlie's Place through the back door and towards the alleyway where they had parked their vehicle. When Faglie saw the two men leave out the back, he left with Dingman out the front door and drove his truck to the back of the bar to find Schultz. Sometime after Faglie left his truck, he punched Schultz in the face, which rendered him unconscious, and then kicked him in the head. Faglie got into his truck and left.

An ambulance was summoned for Schultz, who was lying on the ground and unresponsive. Schultz was taken to the hospital where he was treated for head trauma. Schultz received stiches above his right eye and was kept at the hospital overnight for observation. The treating doctor opined that Schultz sustained at least two or three blows to his head. Schultz, however, was unable to remember the incident. Upon discharge, Schultz was advised not to work for a week because of a possible concussion.

2

The next evening following the incident, January 26, 2016, Faglie and Dingman returned to Charlie's Place. Phyllis Haba, the owner of the bar, called the police. At about 6:15 p.m., three officers, including Officer Daniel Delgadillo, responded to Haba's call, and sought to identify and interview Faglie and Dingman.

Haba met the officers outside, where she showed the officers pictures of Faglie and Dingman from her cell phone and informed the officers that the two men were sitting at the bar. Haba told Officer Delgadillo that a bar patron said the two men were involved in the incident with Schultz. Officer Delgadillo informed Haba that the officers would ask Faglie and Dingman to talk with them outside the bar to avoid any problems. Officer Delgadillo also explained that the officers would interview the two men, "talk to them about what happened," and see if they would "fess up" to the incident.

Officer Delgadillo approached Faglie and Dingman at the bar and asked, "Hey guys, can I talk to you outside please?" Faglie and Dingman agreed to accompany the officer outside. Once outside, Officer Delgadillo separated Faglie and Dingman and asked for Faglie's identification. Officer Delgadillo then interviewed Faglie. The interview was recorded on the officer's bodycam.

Officer Delgadillo began the interview by saying, "I'm assuming you know what we are here for." Faglie responded, "The boy the other night?" to which Officer Delgadillo stated, "Yeah, what was going on with that?" Faglie then explained, in a narrative manner, his version of the incident with Schultz.

Faglie said he and Dingman had gone to the bar where they sat near Schultz. Schultz started "talking shit" and began pointing at Faglie and Dingman, saying that he would beat their asses. Faglie told Schultz to "shut up," and explained that they were not bothering anybody. Walburn and Dingman then bought shots for the four men. According to Faglie, Schultz continued to ramble and told Walburn, "I'll fucking kill them both."

3

Faglie asked if Schultz was referring to him and Dingman, to which Schultz responded, "Hell yeah, I'll kill . . . ." Faglie then slapped the bar and said "if you want something, . . . let's go outside." Schultz, however, refused to go outside.

After the two men continued to argue, the bartender told Faglie and Schultz to quiet down or else she would call the police. Faglie left the bar area and sat at a table by the front door. When Faglie saw Schultz and Walburn go out the backdoor of Charlie's Place, he and Dingman left by the front door. Faglie got in his truck and drove around to the back of the bar.

According to Faglie, in the alley, he saw Walburn but did not see Schultz. Faglie checked the back door to see if Schultz went back inside the establishment, but did not see him. Then, according to Faglie, as he began walking to his truck, Schultz came around a fence and said, "I'm going to whoop your ass." Faglie claimed that Schultz came at him while putting his hand in his coat pocket. In response, Faglie punched Schultz which "knocked him straight out." Once Schultz fell to the ground, Faglie kicked him in the head twice before Dingman pushed Faglie back and said to stop. According to Faglie, after another bar patron threatened to "whoop" them, Faglie and Dingman got into the truck and left.

After listening to Faglie's narrative account, Officer Delgadillo said he was going to ask some questions and told Faglie that he was going to read him his rights. Officer Delgadillo assured Faglie that just because he was being read his rights did not mean he was under arrest or in any trouble. Officer Delgadillo then read Faglie his *Miranda* rights. When asked why he went out back looking for Schultz, Faglie stated he went out back since Schultz threatened to kill him and he wanted to "see what the deal was." Upon hearing Faglie's responses, Officer Delgadillo arrested him.

The State charged Faglie with aggravated battery in violation of K.S.A. 2015 Supp. 21-5413(b)(1)(B), a severity level 7 person felony. Prior to trial, Faglie moved to suppress the incriminating statements he made to Officer Delgadillo. Following an evidentiary hearing, the district judge denied Faglie's motion and determined his statements were admissible, finding:

"It does appear that the first statement given by [Faglie] in this case was not a custodial statement. There was an investigatory inquiry prior to arrest, which was appropriate. . . . He appeared to understand what he was saying and appeared to make voluntary statements to the officer in response to the officer's inquiry. In fact, the officer didn't really ask very many questions until after he advised *Miranda* which occurred prior to the arrest and the arrest occurred after . . . the post-*Miranda* statement was given as well.

"Mr. Faglie's statement to the officer initially was more of a narrative form about what happened. Officers have the right to inquire of witnesses as to events, what happened to determine what—how they should proceed on their investigation and that's what this questioning was.

"So I—and I would note that even though the officers did go into the bar, they asked the defendant if he would come out and the defendant indicated he would come out. He was not forcibly removed from the bar, but he just left the bar on his own accord to visit with the officers."

The case proceeded to trial. During trial, Faglie's counsel objected to the lack of a self-defense instruction. The district judge concluded that a self-defense instruction was not warranted and, as a result, would not be given to the jury:

"I've looked at the case law on self-defense. The facts of this case, even though [Officer] Delgadilo did not use the word 'confront' and [Faglie], I think used the [']I wanted to go see what the deal was['] or something like that. Essentially, the way I read the law on self-defense, it's not there. There's not sufficient evidence to support the giving of that instruction under the facts of this case. One goes to the back door and the other goes out the front door and then you go around and confront them in the back, you can't invite the self-defense issue."

5

On October 3, 2016, Faglie was found guilty of aggravated battery. He was sentenced to 16 months in prison on December 21, 2016. Faglie appeals.

SELF-DEFENSE JURY INSTRUCTION

On appeal, Faglie contends the district court committed reversible error when it denied his request for a self-defense instruction. The State responds that a self-defense instruction was not factually appropriate and, alternatively, any error in refusing to give Faglie a self-defense instruction was harmless.

Our progression of analysis and corresponding standards of review for jury instruction issues are well established:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied*, 565 U.S. 1221 (2012).'" *State v. Ruiz-Ascencio*, 307 Kan. 138, 141, 406 P.3d 900 (2017) (quoting *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 [2016]).

It is undisputed that Faglie preserved this issue for appellate review since he sought a self-defense instruction during trial. See *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). The parties also agree that a self-defense instruction is legally appropriate for the charge of aggravated battery. As a result, the critical question regarding this issue is whether a self-defense instruction was factually appropriate given the facts and circumstances of this case.

6

An instruction is factually appropriate if there is sufficient evidence, when viewed *in the light most favorable to the defendant*, for a rational fact-finder to find for the defendant on that theory. *State v. Dupree*, 304 Kan. 377, 397, 373 P.3d 811 (2016). In order for a self-defense jury instruction to be factually appropriate, there must be sufficient evidence presented to establish the right to use self-defense as described in K.S.A. 2015 Supp. 21-5222. *State v. Salary*, 301 Kan. 586, 593, 343 P.3d 1165 (2015). This statute provides:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.
>
> . . . .
>
> "(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person." K.S.A. 2015 Supp. 21-5222.

The language of subsection (a) sets forth a two-pronged test to determine whether the use of force is legally justified. As applied to this case, the first prong is subjective and requires a showing that Faglie sincerely believed it was necessary to use force to defend himself against imminent use of unlawful force. The second part is objective. It requires a showing that a reasonable person in Faglie's circumstances would also conclude that force was necessary to defend oneself against imminent use of unlawful force. See *Salary*, 301 Kan. at 593-94.

While the parties dispute whether this two-pronged test was satisfied, the threshold issue, as found by the district court, is whether Faglie may invoke self-defense. The State asserts that Faglie is not entitled to claim self-defense because (1) he used excessive force and (2) he was the initial aggressor. We first consider the State's argument that Faglie used excessive force.

The State contends that Faglie used excessive force by stomping on Schultz' head after Schultz was knocked to the ground. A person using self-defense is only justified in using such force "*to the extent* it appears to such person and such person reasonably believes that such use of force is *necessary to defend such person* or a third person against such other's imminent use of unlawful force." (Emphasis added.) K.S.A. 2015 Supp. 21-5222(a). "[I]t is well settled that a person cannot use greater force than is reasonably necessary to resist the attack." *State v. Marks*, 226 Kan. 704, 712, 602 P.2d 1344 (1979).

"Normally, whether the force is excessive is a question for the jury." *State v. Holley*, No. 92,861, 2006 WL 851236, at *4 (Kan. App. 2006) (unpublished opinion). However, a self-defense instruction is "not required if the force used by defendant in the claimed self-defense is excessive as a matter of law." PIK Crim. 4th 52.200, Notes on Use (2017 Supp.). In this case, the district court did *not* conclude as a matter of law that excessive force was used.

We are unable to conclude that this is the exceptional case in which the force used by the defendant may be considered excessive as a matter of law. Faglie and Schultz had participated in a heated argument inside the bar wherein Schultz twice threatened to kill Faglie. In the alley behind the bar, Schultz again threatened Faglie, and suddenly approached him with his hand in his coat pocket. Based on Schultz' behavior, a jury could reasonably conclude that Schultz was about to use a weapon or cause bodily harm to Faglie. As a result, a rational jury could have found that Faglie's actions of punching Schultz once and kicking him twice was necessary to debilitate Schultz from using force or deadly force. All things considered, and without a finding of excessive force by the district court, we are persuaded that whether Faglie's force was excessive was an issue for the jury to consider and determine.

We next consider the State's argument that a self-defense instruction was not appropriate because Faglie was the initial aggressor. This is the sole basis the district court found as a matter of law that precluded the giving of a self-defense instruction.

An aggressor who initially provokes the use of force against himself or herself may only claim self-defense in limited circumstances. *Salary*, 301 Kan. at 594. Under K.S.A. 2015 Supp. 21-5226(c), the justification of self-defense provided in K.S.A. 2015 Supp. 21-5222 is unavailable to a person who:

> "(c) . . . *initially provokes the use of any force* against such person or another, unless:
> (1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or
> (2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." (Emphasis added.) K.S.A. 2015 Supp. 21-5226(c).

The district court determined that a self-defense instruction was not warranted because Faglie provoked the incident when he went outside to the rear of the bar to "confront" Schultz. On the other hand, Faglie claims that, in the light most favorable to him, he was not the initial aggressor because he went around to the back of the bar merely to "see what the deal was" and it was Schultz who threatened to "whoop [his] ass" and charged at Faglie.

As a general proposition, a defendant may not claim self-defense if he deliberately places himself in a position where he has reason to believe his presence will provoke violence. See 6A C.J.S., Assault § 111. In *Salary*, the defendant, who was in the victim's home, knew "'something was gonna happen'" when the victim became upset. 301 Kan. at

9

595. As a result, the defendant armed himself with a handgun. The victim told the defendant to leave his house stating, "'Either you're gonna walk out or you're gonna get carried out.'" 301 Kan. at 596. After the defendant refused to leave, the defendant believed the victim was about to pull out a gun, so he shot the victim.

Our Supreme Court in *Salary* determined that the defendant's choice to stay in the victim's house constituted provocation and "necessarily eliminates the factual basis for a self-defense instruction." 301 Kan. at 596. In so concluding, the court noted that a defendant is ineligible for a self-defense instruction under the factual situation of "leaving a confrontation with an individual and then returning with a loaded firearm and shooting that same person." 301 Kan. at 597. *Salary* is factually distinguishable, however, from the facts of this case.

To provoke the use of force, the defendant "must have said or done something, for the purpose of inducing an attack, which was calculated to bring about that result." 6A C.J.S., Assault § 111. For example, as a general proposition, "the seeking of a person for an explanation" does not amount to provocation of physical force. 6A C.J.S., Assault § 111.

Our Supreme Court has found that provocation is a jury question when a defendant approaches a person involved in a prior altercation with the defendant if there is evidence that the defendant approached that person *for a purpose other than vindication or continuing the altercation. State v. Hunt*, 257 Kan. 388, 393, 894 P.2d 178 (1995); *State v. Beard*, 220 Kan. 580, 581-82, 552 P.2d 900 (1976). In *Hunt*, the defendant claimed he shot a victim in self-defense when the defendant obtained a gun after being beaten by the victim, he approached the victim to ask why the victim had beaten him, the victim shoved the defendant, and the victim put his hand inside his pocket. The court found that the question of who was the aggressor was one for the jury noting that, although the defendant told officers he wanted to talk to the victim about the

10

prior beating, he also told others he would shoot the victim in the head. 257 Kan. at 393. *Hunt* provides helpful guidance to resolve this question.

When viewing the facts in the light most favorable to Faglie, after Faglie saw Schultz leave, he drove to the back of the bar not to necessarily "confront" Schulz but, according to him, to "see what the deal was." When Faglie gave up his search for Schulz and was about to leave, Schultz came around a fence and said "I'm going to whoop your ass." Schultz then came at Faglie and stuck his hand in his pocket. Reacting to what Faglie perceived as a threatening action, he punched and kicked Schultz.

Given these facts, it was a question for the jury to determine whether Faglie provoked the use of force by Schultz. Faglie's stated reason for approaching Schultz was to seek an explanation and was not necessarily to provoke a confrontation. Moreover, a jury could conclude that Faglie did not deliberately place himself in a position where he knew his presence would provoke force by Schultz. The exchange in the bar was a verbal dispute, Schultz declined Faglie's request to settle their differences outside, and there was a length of time between the verbal dispute and Schultz leaving the bar.

Although Faglie could have avoided any confrontation by not seeking out Schultz behind the bar, his action does not preclude a self-defense instruction. Unlike the defendant in *Salary*, Faglie did not necessarily engage in conduct knowingly calculated to continue and escalate an ongoing dispute. Faglie did not arm himself or otherwise take action suggesting that he believed a physical altercation would occur if he spoke to Schultz. As in *Hunt*, whether Faglie was the initial aggressor was a question for the jury. The district court erred by determining that Faglie was not entitled to a self-defense instruction because he was an initial aggressor as a matter of law.

While this case was pending on appeal, our Supreme Court issued an opinion addressing the propriety of not giving a self-defense instruction in *State v. Barlett*, 308

11

Kan. ___, 418 P.3d 1253 (2018). In *Barlett*, the defendant was involved in a lengthy gun battle between three moving carloads of individuals which resulted in Barlett discharging his firearm into the other car and killing one of the occupants. At trial, Barlett sought a self-defense instruction based on the occupants of the other car shooting firearms into the car that he was riding in. The district court denied the request for a self-defense instruction and our Supreme Court affirmed. In its holding, the Supreme Court stated:

"This court has held that a self-defense instruction is not available when the parties are engaging in mutual combat. Mutual combat occurs when both parties enter into the combat willingly or voluntarily; it implies a common intent to fight. It does not matter which party initiated the confrontation when both parties willingly engaged in it." 418 P.3d at 1258.

The Supreme Court concluded:

"One may engage in behavior that does not violate a law but that promotes and escalates violent tensions so as to vitiate claims of self-defense. The record in the present case shows that the individuals in all three cars were spoiling for a fight, and the escalating tensions precluded a self-defense instruction." 418 P.3d at 1258.

Unlike *Barlett*, the evidence in this case does not show that Faglie and Schultz had been engaged in mutual combat at the time Faglie struck Schultz. Given Schultz' inability to remember the circumstances of the violent encounter, his intentions in coming towards Faglie prior to being struck are unknown. On the other hand, the jury was left with Faglie's exculpatory account that he only wanted to talk with Schultz about the prior argument inside the bar, and he was simply protecting himself from an unprovoked attack. In short, unlike *Barlett*, the evidence in this case did not support a finding of mutual combat as a matter of law sufficient to preclude the giving of a self-defense instruction.

12

Having found that Faglie was not precluded from invoking the justification of self-defense as a matter of law, we have no difficulty in finding that a self-defense instruction was factually appropriate in this case. There was evidence that, while in the bar, Schultz pointed at Faglie and claimed he was going to beat him. The argument between the two men escalated and Schultz twice threatened to kill Faglie. Once outside the bar, Schultz again threatened bodily harm, and approached Faglie while putting his hand in his pocket.

Viewed in a light most favorable to Faglie, we conclude the trial evidence supported giving the jury a self-defense instruction. A rational fact-finder could have determined that Faglie honestly believed force was necessary to defend himself from Schultz' use of unlawful force and that a reasonable person in the same circumstances would have come to the same conclusion.

To provide an instruction under these circumstances is a minimal obligation because the defendant bears no particular burden of proof regarding self-defense; a jury need only conclude that the evidence of self-defense creates a reasonable doubt over guilt to render an acquittal. See *State v. Johnson*, 258 Kan. 61, 66, 899 P.2d 1050 (1995). Because there was some evidence to support Faglie's theory that he acted in self-defense, a decision on that issue necessarily should have been entrusted to the jurors. Although the district court erred by denying Faglie's request for such an instruction, we next turn to whether this error was harmless.

When the district court errs by failing to provide an instruction to the jury, our court assesses whether the error requires reversal by determining whether it was harmless. *Ruiz-Ascencio*, 307 Kan. at 141. The instructional error here affected Faglie's constitutional right to present a theory of defense. See *State v. Andrew*, 301 Kan. 36, 46-47, 340 P.3d 476 (2014). Thus, the error is harmless only if the State proves beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire

13

record, i.e., there is no reasonable possibility that the error contributed to the verdict. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

We cannot conclude beyond a reasonable doubt that the failure to instruct on self-defense did not affect the jury's verdict. The State argues that any error was harmless because, if an instruction on self-defense was given, the jury would have determined that Faglie was the initial aggressor and he used excessive force. However, as previously discussed, we find that a reasonable jury could have concluded that Faglie was not the initial aggressor and that he did not use excessive force. As a result, the failure to provide Faglie's requested self-defense instruction was reversible error.

We reverse the aggravated battery conviction, vacate the sentence, and remand for a new trial with directions to provide the jury with a self-defense instruction if similar evidence is admitted at the retrial.

ADMISSION OF INCRIMINATING STATEMENTS

For this next issue, Faglie contends the district court erred by admitting into evidence the incriminating statements he made to Officer Delgadillo. Faglie argues his statements to Officer Delgadillo were not admissible because he was subjected to a custodial interrogation and he did not waive his *Miranda* rights prior to making the statements. In support of this claim, Faglie asserts that no reasonable person would have felt free to terminate the encounter with Officer Delgadillo and the two other officers.

In reviewing a district court's ruling on a motion to suppress, we generally employ a bifurcated standard. We first review the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is then reviewed de novo. *State v. Davis*, 306 Kan. 400, 416, 394 P.3d 817 (2017). But when the material facts to a trial court's decision on a motion to suppress

14

evidence are not in dispute, the question of whether to suppress evidence is a question of law over which an appellate court has unlimited review. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

Here, the material facts are not in dispute. The essential issue is whether the district court erred by concluding that Faglie was not subjected to a custodial interrogation and, as a result, admission of his statements was appropriate without the requirement of a waiver of his *Miranda* rights. Under these circumstances, we employ a "de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. [Citations omitted.]" *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012).

Under the Fifth Amendment to the United States Constitution, the State may not use statements made by a defendant during a custodial interrogation unless the State provided procedural safeguards to preserve the defendant's privilege against self-incrimination. *Miranda*, 384 U.S. at 444.

> "The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. As custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. [Citations omitted.]" *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 (2014).

The United States Supreme Court in *Miranda* emphasized that these constitutional protections apply only to custodial interrogations, not to "general on-the-scene police questioning of a suspect in the fact-finding process." *State v. Vanek*, 39 Kan. App. 2d 529, 532, 180 P.3d 1087 (2008). In particular, the Supreme Court noted:

15

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." [Citation omitted.] *Miranda*, 384 U.S. at 477-78.

In making the determination of whether questioning is investigatory or custodial, an objective standard is used. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000). "The proper analysis is how a reasonable person in the suspect's position would have understood the situation." 270 Kan. 173, Syl. ¶ 6.

Our Supreme Court has identified eight factors for courts to consider in determining whether police questioning of an individual is investigative or custodial. These factors include:

"(1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, *e.g.*, whether the person was allowed to leave, was detained further, or was arrested after the interrogation." *Lewis*, 299 Kan. at 835.

We do not apply these factors mechanically or treat them as if each factor bears equal weight. Instead, every case must be analyzed on its own facts and the importance of each factor may vary in different cases. *State v. Morton*, 286 Kan. 632, 640, 186 P.3d 785 (2008).

16

*The Time and Place of Interrogation*

"Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weighs against a conclusion that an interview was custodial." *Warrior*, 294 Kan. at 497. Here, the interrogation occurred in the evening on a public sidewalk. Because the interview was performed in a public location and at a reasonable time, this factor weighs in favor of a finding that Faglie was not in custody.

Faglie asserts that the place was "hardly a neutral situation," since he was removed from the bar and taken outside by three officers. However, Faglie voluntarily agreed to go outside and talk to the officers. Kansas courts have often found a noncustodial situation occurs when an individual voluntarily leaves where they are presently located and travels to a police station. See, e.g., *State v. Trussell*, 289 Kan. 499, 508-09, 213 P.3d 1052 (2009); *State v. Jones,* 283 Kan. 186, 196-97, 200-01, 151 P.3d 22 (2007); *State v. Ninci*, 262 Kan. 21, 32-33, 936 P.2d 1364 (1997). In this case, not only did Faglie voluntarily leave the bar, but his interrogation was on a public sidewalk with individuals entering and leaving the bar.

*Duration of Interrogation*

The length of time between when Officer Delgadillo asked Faglie to come outside and when Faglie was placed under arrest was about seven minutes. Faglie was only interviewed about four minutes before being read his *Miranda* rights. The brief duration of the interview suggests it was noncustodial.

*The Number of Law Enforcement Officers Present*

Officer Delgadillo interviewed Faglie while two other officers were in the vicinity. The officer interviewing Dingman was about 15 to 20 feet away from where Faglie was

17

being interrogated. The third officer was standing near the entrance of the bar, close to where Faglie was being interviewed.

The number of officers present does not necessarily support a finding of a custodial interrogation. Faglie asserts the number of officers suggests he was in custody because if the interrogation was "mere fact-finding, the officers would not have arrived together en masse." However, two of the officers were present in order to conduct separate interviews of Faglie and Dingman and obtain their independent statements uninfluenced by the other.

Moreover, in *Warrior*, our Supreme Court found that two officers present while conducting an interrogation in a hospital room suggested neither that the interview was custodial nor investigatory in nature. 294 Kan. at 498. As a result, this factor is of little weight in support of a finding that the interview was custodial.

*The Conduct of the Officer and the Person Questioned*

The interrogation was not contentious. Officer Delgadillo asked Faglie if he would talk with the officers outside. Once outside, Officer Delgadillo asked which one of the men was Dingman and said another officer would talk with him. Then Officer Delgadillo asked for Faglie's identification and stated, "I'm assuming you know what we are here for." Faglie responded, "The boy the other night?" and Officer Delgadillo asked, "Yeah, what was going on with that?" Faglie then provided his account of what occurred in a narrative fashion. Before advising Faglie of his *Miranda* rights, Officer Delgadillo asked only a few questions, mostly limited to clarifying which persons Faglie was referring to in his narrative. Given the informal and narrative manner in which the interview was conducted, this factor supports a finding of a noncustodial interview.

*Actual Physical Restraint or Its Functional Equivalent*

Prior to being read his *Miranda* rights, Faglie was not placed in handcuffs, none of the officers touched Faglie, nor was there any physical restraint. Faglie argues that since the officers were armed and he was removed from the bar, he was under the functional equivalent of physical restraint. At no point, however, did the officers display their weapons. This factor supports a noncustodial interview.

*Whether the Person Is Being Questioned As a Suspect or a Witness*

When Faglie was questioned, the officers were responding to a call from Haba suggesting that individuals involved in the incident with Schultz were in the bar. Before the interview, Faglie was a "person of interest." Officer Delgadillo testified that the main purpose of the interviews was to have Faglie and Dingman identified and "see what their involvement was."

Once Officer Delgadillo arrived at Charlie's Place, Haba informed him that Faglie was involved in the altercation with Schultz. Based on the information provided by Haba, Officer Delgadillo had evidence that Faglie was involved, but he did not know the extent of his involvement. Still, Officer Delgadillo said the officers would "talk to them about what happened" and see if they would "fess up" to it.

In arguing that he was in custody, Faglie relies heavily on the fact that Officer Delgadillo told Haba that he would see if Faglie would "fess up." The determination of custody, however, depends on the objective circumstances of the interrogation, not the personal, subjective views of the officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

To the extent that Faglie was a suspect in the investigation, he was not subjected to any accusations by Officer Delgadillo. Instead, to the objective observer, Officer Delgadillo's open-ended questions suggested that he thought that Faglie may have been involved in the aggravated battery of Schultz and his inquiry was focused on determining the nature and extent of his involvement. At the time of the interview, Faglie was at least a person of interest and possibly a suspect, but given the nature of the interview, a reasonable person in Faglie's position would believe Officer Delgadillo was still in the investigatory phase of the case. Under these circumstances, this particular factor is not determinative of the custodial interrogation issue. See *State v. Whitt*, 46 Kan. App. 2d 570, 575, 264 P.3d. 686 (2011).

*Whether Faglie Was Escorted by Officers or Arrived Under His Own Power*

Officer Delgadillo's investigative plan was to talk to Faglie and Dingman outside the bar to avoid any potential problems inside the establishment. Once inside the bar, Officer Delgadillo asked Faglie and Dingman, "Hey guys, can I talk to you outside please?" Faglie agreed to go outside and walked out of the bar. At no point did any of the officers touch Faglie on his way out the bar. Importantly, Officer Delgadillo asked rather than demanded that Faglie speak with him outside. See *State v. Swingle*, No. 107,856, 2013 WL 4729565, at *4 (Kan. App. 2013) (unpublished opinion) (a mere request to move a police encounter to another location does not suggest a person would not feel free to terminate the encounter). This factor suggests a noncustodial interview.

*The Result of the Interrogation*

After Faglie provided his narrative in which he admitted to punching and kicking Schultz, Officer Delgadillo advised him of his *Miranda* rights. Before reading the *Miranda* warnings, however, Officer Delgadillo assured Faglie that he was not being placed under arrest. Once Faglie waived his *Miranda* rights and provided incriminating

responses to specific questions, he was placed under arrest. This factor supports a custodial interrogation.

*Applying the Eight Factors to the Totality of Circumstances*

We are persuaded that the totality of circumstances establishes that a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. Given the brevity of the interview on a public sidewalk with bystanders present, the lack of any restraints on Faglie, the few questions asked by Officer Delgadillo, and Faglie's narrative responses to the officer's inquiries, we conclude that Faglie was not deprived of his freedom in a significant way. We conclude that Faglie was not in custody before Officer Delgadillo advised him of his *Miranda* rights.

In summary, the district court did not err in concluding that Faglie was not in custody at the time of Officer Delgadillo's questioning. The undisputed evidence shows that Officer Delgadillo engaged in an investigatory questioning of Faglie and, as a result, Officer Delgadillo did not have to advise him of his *Miranda* rights and obtain a waiver of those rights before questioning. Accordingly, we affirm the district court's denial of the motion to suppress statements.

Affirmed in part, reversed in part, sentence vacated, and remanded with directions.